UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA,

     Plaintiff,

                           Case No. 16-20222
v.                               Hon. Arthur J. Tarnow

RAMEL HOWARD,

     Defendant.

_____/

## United States' Response Opposing
## the Defendant's Motion for Compassionate Release
## or Recommendation for Home Confinement

The Defendant, Ramel Howard, was a key player in a large scale heroin and cocaine drug trafficking organization that operated for more than four years. It was an enterprise that could not have run at nearly the same effectiveness without him, and he played multiple roles. He negotiated and saw through the purchase of bulk amounts of drugs on the West Coast, arranged their transport to the Detroit area, and helped to launder the proceeds from their sale. Following a significant investigation involving wiretaps and other sophisticated techniques, Howard was arrested and prosecuted. He eventually pleaded guilty,

was sentenced to 60 months' of imprisonment, and began serving his sentence on October 9, 2018.

Howard has written a letter to the Court requesting his immediate release based on the COVID-19 pandemic. In response, the Court appointed the Federal Defender Office to represent Howard and ordered the parties to brief whether Howard might be eligible for either home confinement under 18 U.S.C. § 3624(c)(2), as extended by the CARES Act § 12003(b)(2), or compassionate release under 18 U.S.C. § 3582(c).   Howard's request should be denied.

*First*, the Bureau of Prisons is already evaluating and releasing inmates most at risk from the COVID-19 pandemic. Following two recent directives from the Attorney General, the Bureau of Prisons is urgently assessing its entire prison population to determine which inmates face the most risk from COVID-19, pose the least danger to public safety, and can safely be granted home confinement. As of April 15, 2020, these directives have already resulted in the release of at least 1022 inmates to home confinement. *See* BOP COVID-19 Website. This process necessarily requires the Bureau of Prisons to prioritize the most pressing cases—identifying the best candidates for release, ensuring

that their homes are suitable for home confinement, and arranging a way to quarantine each of them for 14 days. Howard should not be permitted to circumvent that ongoing process by petitioning the Court, particularly given the absence of any judicial authority to direct or review the Bureau of Prisons' home-confinement decisions.

*Second*, Howard does not qualify for compassionate release. Because Howard only just now (via an email similar to the letter that he sent the Court) sought compassionate release from the Bureau of Prisons based on COVID-19, as required under 18 U.S.C. § 3582(c)(1)(A), the Court does not have jurisdiction to address his COVID-19-based argument until he exhausts his administrative remedies. Nor, in any event, do Howard's characteristics qualify him for compassionate release under that statute. At 46 years old, Howard is a relatively young man, whose health issues are unremarkable and stable.

## Background

The Defendant, Ramel Howard, played a significant role in a large scale heroin and cocaine drug trafficking organization that was peddling its poison in Detroit. This was no small scale enterprise;

Howard was one of the leaders within this drug trafficking pipeline that involved more than a dozen people, moved multiple kilograms of different kinds of controlled substances, and generated hundreds of thousands of dollars in proceeds. Howard's role was key: he had the connections to sources of supply in California and the southwest United States, and he kept the flow of drugs coming. Of course, buying and selling drugs at quantity is a cash intensive business, and Howard also played a vital role in managing the moving and disposing of those funds. Howard helped to launder at least nearly $450,000 of drug proceeds.

Howard has only a minimal criminal history, but it is important to understand that the conspiracy that Howard helped lead was a years' long endeavor, reaching back in time from the March 2016 indictment to 2012. (R.1: Indictment). At the time of the PSR, when Howard was 43 years old, though he claimed to own his own real estate firm, Howard had no employment history that could be verified at any point in his adult life. (PSR ¶ 51). This is because Howard was a professional drug dealer, and a good one.

Howard was prosecuted, and following a plea of guilty was eventually sentenced to 60 months' of imprisonment. Howard began serving his prison sentence on October 9, 2018, and is currently incarcerated at FCI Morgantown, in West Virginia. He is 46 years old, and his projected release date is January 9, 2022. His only underlying medical conditions are hypertension, hyperlipidemia, diabetes, and asthma, all of which are under treatment by prescription drugs and are stable. *See* Exhibits 1 and 2, Medical Records (sealed). Nevertheless, Howard has moved for compassionate release, citing his medical conditions and the COVID-19 pandemic. Howard has made this request despite being only at the very beginning of the administrative process with the Bureau of Prisons, having requested release by an email to his case manager. *See* Exhibit 3, Email Request for Compassionate Release.

## Argument

**I.    Federal prisoners are already being considered for home confinement during the COVID-19 pandemic, and Howard should not be permitted to cut in line over more vulnerable ones.**

### A.    The Bureau of Prisons has new authority to place federal prisoners in home confinement.

The Bureau of Prisons is already increasing the placement of federal prisoners in home confinement based on COVID-19, and its

authority to do so has now been expanded. Previously, 18 U.S.C. § 3624(c)(2) authorized the Bureau of Prisons "to place a prisoner in home confinement" only "for the shorter of 10 percent of the term of imprisonment . . . or 6 months." *Id.* But new legislation now temporarily permits the Bureau of Prisons to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement." Coronavirus Aid, Relief, and Economic Security Act (CARES Act), § 12003(b)(2), Pub. Law 116-136, 134 Stat 281, 516 (Mar. 27, 2020).

In addition, the Attorney General has recently issued two directives to the Bureau of Prisons, making the finding that triggers the increased statutory authority under § 3624(c)(2) and ordering the Bureau of Prisons to use the "various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic." (03-26-2020 Directive to BOP, at 1 (attached as Ex. 1); 04-03-2020 Directive to BOP, at 1 (attached as Ex. 2)). The Attorney General's directives remind the Bureau of Prisons to consider "the statutory requirements for home confinement." (03-26-2020 Directive to BOP, at 1). These statutory requirements include the

requirements in 18 U.S.C. § 3624(c) and (g) for home confinement in general, as well as the requirements in 34 U.S.C. § 60541(g) for some elderly and terminally ill offenders.

The directives also require the Bureau of Prisons to identify the inmates most at risk from COVID-19 and "to consider the totality of circumstances for each individual inmate" in deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1). And the directives instruct the Bureau of Prisons to consider "*all* at-risk inmates—not only those who were previously eligible for transfer" into home confinement. (04-03-2020 Directive to BOP, at 2 (emphasis added)).

In evaluating each inmate under these new directives, the Bureau of Prisons must balance at least four general considerations:

1.) The inmate's age and vulnerability to COVID-19;

2.) Whether home confinement would actually decrease the inmate's risk of contracting COVID-19;

3.) Whether the inmate is at one of the facilities most affected by COVID-19; and

    4.) Whether the inmate's release into home confinement would

       risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP). Evaluating

the inmate's risk to the public requires assessing not only the inmate's

crime of conviction, but also his criminal history, the resources and

security level of his prison facility, his proposed home-confinement

location, his disciplinary record in prison, and his risk of recidivism.

(03-26-2020 Directive to BOP).

    Those criteria make sense. The Bureau of Prisons cannot open its

facilities' gates indiscriminately and unleash tens of thousands of

prisoners, en masse, on the public at large. (04-03-2020 Directive to

BOP, at 2–3). That is true in normal times, and it is particularly true

given the strain on our first responders right now. As recent news

reports have confirmed, a significant percentage of local law

enforcement in many cities has either contracted COVID-19 or been

placed under quarantine. Officers who remain on the job are stretched

to their limits. Domestic violence is on the rise. Shootings and murders

are increasing. *See [Detroit cops fight violence spike, social distancing](#)*

*[violations with depleted manpower](#)*, Detroit News (Apr. 8, 2020). And

innovative criminals are taking advantage of the public's desperation by perpetrating new types of crime—including COVID-19-based fraud schemes. There are real risks to public safety right now, and those risks will only increase if communities are faced with a sudden influx of prison inmates. That is just one reason, among many, why the Bureau of Prisons must focus on releasing inmates who are the most vulnerable to COVID-19 and whose release will least endanger public safety.

Another reason is the dilemma that everyone will face if an incorrigible inmate is granted home confinement and then either violates his home-confinement conditions or commits additional crimes. The home-confinement statutes permit—and in some instances, require—the Bureau of Prisons to revoke home confinement and re-incarcerate an inmate if he reoffends. 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2). This means that if an inmate is released and then commits a serious crime, the Bureau of Prisons and the justice system will face a difficult choice: either (i) violate the statute, permit the inmate to remain free, and give him de facto authorization to continue harming the public as much as he pleases, or (ii) return the inmate to custody and risk him bringing COVID-19 back into the prison system,

placing other inmates at risk. That is all the more reason to get the
initial release decision right, and it is why the Bureau of Prisons must
carefully consider whether an inmate should be granted home
confinement.

> **B.    Even if Howard is eligible for home confinement, he
> should not be permitted to cut in front of other
> inmates for consideration by the Bureau of Prisons.**

Howard might or might not be granted home confinement under
the new legislation and Attorney General's directives. But either way,
he should not be permitted to push his way in the queue past other
inmates who are less dangerous and more vulnerable than he is. At age
46, Howard is not elderly, and he is therefore not at higher risk from
COVID-19 because of his age. Howard points to his medical conditions,
which include hypertension, hyperlipidemia, diabetes, and asthma, but
all of these conditions are in treatment via a standard drug regimen,
and Howard reported to his BOP medical care provider in February
2020 that he had not had an asthma attack in five years. (Exhibit 2, Pg.
8). Because of the novelty of the coronavirus that causes COVID-19, and
the fact that Howard has provided no information concerning an
evaluation of whether his particular medical ailments heighten his risk

of a more severe case were he to contract the virus, it is simply
unknown whether Howard is more at risk of a severe case than other
inmates, or more at risk in an institutional setting, rather than in the
community. But even assuming Howard's medical conditions increases
his risk, there are undoubtedly other inmates whose medical conditions
are more serious and who are more at risk from COVID-19—and whose
evaluation and potential release should take priority over Howard's.
Howard should not be permitted to cut in front of those other, more
vulnerable inmates.

Given the circumstances of Howard's offense, it is also
questionable whether he would abide by the terms of home
confinement—much less adhere to the CDC's social-distancing protocols
or the Governor's stay-at-home order. Howard engaged in a wide
ranging drug conspiracy, making daily choices not to abide by the law
for years. Time and again, Howard has been unwilling to follow even
these far more basic societal norms. Why would anyone think that he
would follow social-distancing protocols or a stay-at-home order?
Because Howard would be unlikely to remain in home confinement or
take those COVID-19 restrictions seriously, he would also be far more

likely than other members of the public to contract COVID-19—perhaps even more likely than he would be in prison—and would also be more likely to spread it to other people. But again, that risk to the public, whatever it may be, is one of the factors that the Bureau of Prisons must evaluate in determining whether Howard should be granted home confinement.

Further, even if the Bureau of Prisons were inclined to release Howard into home confinement, it must first ensure that any home-confinement location is suitable for release, does not place him at an even greater risk of contracting COVID-19, and does not place members of the public at risk from him. (03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP). Although the Bureau of Prisons is expediting that process—particularly at the facilities most affected by COVID-19—it cannot happen overnight; nor can it handle every potentially eligible inmate simultaneously. The Bureau of Prisons should therefore be permitted to prioritize the inmates who are least dangerous to the public and most vulnerable to COVID-19. And Howard should not be permitted to interfere with that process just by petitioning the Court. *See Wolff v. McDonnell*, 418 U.S. 539, 566 (1974) (cautioning that courts

"should not be too ready to exercise oversight and put aside the judgment of prison administrators").

The Bureau of Prisons is also working around the clock to protect any inmates who are not eligible for discretionary release. Inmates at every institution, including FCI Morgantown, are being protected by a new shelter-in-place protocol to decrease the spread of the virus. Even prior to the national lockdown, the Bureau of Prisons had already instituted a number of precautionary measures to reduce the risk of infection. A full run-down of those measures is available on the Bureau of Prisons' COVID-19 Action Plan website. Although no plan is perfect, these measures will help federal inmates remain protected from COVID-19 and ensure that they receive any required medical care during these difficult times. Measures like these have thus far kept FCI Morgantown, where Howard is incarcerated, free of any known cases of COVID-19 infection per released information as of April 15, 2020. https://www.bop.gov/coronavirus/

### C. The Bureau of Prisons' decisions are not subject to judicial review—much less preemptively.

In any event, there is no jurisdiction for the Court to order home confinement or to review the Bureau of Prisons' decisions on which

inmates are, or are not, granted home confinement. Neither § 3624(c) nor § 60541(g) contains any provision for judicial review. So to the extent Howard asks this Court to order his release into home confinement, his motion must be dismissed for lack of jurisdiction. *See United States v. Garza*, 2020 WL 1485782 (S.D. Cal. Mar. 27, 2020) (recognizing that "the Court lacks authority to designate home confinement"); *United States v. Brown*, 2020 WL 1479129, at *1 (D. Md. Mar. 26, 2020) ("It is inherently the authority of the Bureau of Prisons to transfer an inmate to home confinement, pursuant to 18 U.S.C. § 3624(c)."); *see also United States v. Patino*, No. 18- 20451, 2020 WL 1676766, at *6 (E.D. Mich. Apr. 6, 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons.").

That is especially true here, because Howard is seeking release from this Court *before* permitting the Bureau of Prisons to evaluate whether he is a good candidate for home confinement. Even in other contexts, when limited judicial review of prison administration is appropriate, inmates are required to exhaust their administrative remedies before challenging "events or conditions relating to their custody." *Little v. Hopkins*, 638 F.2d 953, 953 (6th Cir. 1981). There is

no basis for Howard to preempt that administrative process here—

particularly given that judicial review of any home confinement

decisions is not permitted at all. Howard, to the extent he is seeking

home confinement, is asking for relief in the wrong forum.

### D.   The Court should decline to recommend Howard for home confinement.

The Court should also decline to issue a judicial recommendation

to the Bureau of Prisons that Howard finish his sentence under home

confinement. Even assuming the Court has the authority to issue such a

recommendation, Howard is not a strong candidate for it. Howard is a

relatively young man, who has several years left of his sentence of

imprisonment, and whose medical conditions are stable.

## II.   The Court should deny Howard's motion for compassionate release.

Section 603(b) of the First Step Act of 2018 amended 18 U.S.C.

§ 3582 to afford inmates the right to seek compassionate release on

their own motion, when previously only the Bureau of Prisons' Director

could do so. But first, inmates must request compassionate release and

exhaust their administrative remedies with the Bureau of Prisons, or

wait 30 days in the event the Bureau of Prisons fails to act on their

request. 18 U.S.C. § 3582(c)(1)(A). Second, a court may only grant compassionate release based on an individual inmate's "extraordinary and compelling reasons," which must be consistent with the Sentencing Commission's policy statement and which the inmate has the burden of showing. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13(1)(A), (3); *United States v. Hamilton*, 715 F.3d 328, 327 (11th Cir. 2013). And third, a court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that the inmate "is not a danger to the safety of any other person or to the community." USSG § 1B1.13(2).

### A.   The Court is barred from granting release because Howard has not exhausted his administrative remedies.

The Court must dismiss Howard's motion, because he has not satisfied the exhaustion requirement for compassionate release under 18 U.S.C. § 3582(c)(1)(A). Before an inmate moves for compassionate release in court, he "must at least ask the Bureau of Prisons[] to do so on [his] behalf and give BOP thirty days to respond." *United States v. Raia*, __ F.3d __, No. 20-1033, at 3 (3d Cir. Apr. 2, 2020) (citing § 3582(c)(1)(A)) (opinion amended on Apr. 8, 2020).

Statutory exhaustion requirements, like the one in § 3582(c)(1)(A), are mandatory. *Ross v. Blake*, 136 S. Ct. 1850, 1855–57 (2016). Those requirements may not be excused, even to account for "special circumstances." *Id.* Rather, as a judge in this district recently held, "[t]he text of 18 U.S.C. § 3582(c) defines mandatory conditions precedent to a defendant filing a motion [for compassionate release] under that section." *United States v. Alam*, No. 15-20351, at 4 (E.D. Mich. Apr. 8, 2020).

Howard has not exhausted his administrative remedies. Howard made an informal request for compassionate release due to risks of COVID-19 on March 29, 2020. (Exhibit 3, Email Request for Compassionate Release). Even assuming that this email were treated as a request, BOP has not yet had its 30 days to respond. Howard has therefore not satisfied § 3582(c)(1)(A)'s mandatory exhaustion requirement.

That failure is fatal to Howard's claim. As the Third Circuit held recently in denying a similar, unexhausted motion for compassionate release, the COVID-19 pandemic does not permit inmates or district judges to bypass § 3582(c)(1)(A)'s exhaustion requirement. *United*

*States v. Raia*, ___ F.3d ___, No. 20-1033, at 8 (3d Cir. Apr. 8, 2020) (opinion amended on Apr. 8, 2020). Rather, "[g]iven BOP's shared desire for a safe and healthy prison environment, . . . strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical— importance." *Id.*; *see also United States v. Alam*, No. 15-20351, at 6 (E.D. Mich. Apr. 8, 2020) ("[T]his failure to exhaust cannot be excused, even in light of the COVID-19 pandemic."); *United States v. Eberhart*, No. 13-CR-00313, 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020) ("Because defendant has not satisfied the exhaustion requirement, the court lacks authority to grant relief [based on COVID-19] under § 3582(c)(1)(A)(i)."). In a decision just issued today, Judge Thomas Ludington here in the Eastern District of Michigan denied, without prejudice, a motion for compassionate release on similar reasoning. *United States v. Kwame Matthews*, 1:14-cr-20427-TLL-PTM, Dkt. No. 320 (E.D. Mich. Apr. 15, 2020). Howard's motion must be denied on this basis alone.

### B.   There are no extraordinary and compelling reasons to grant Howard compassionate release.

Even if Howard had exhausted his administrative remedies, compassionate release would be improper. The First Step Act did not

change the substantive requirement that compassionate release be

"consistent with applicable policy statements issued by the Sentencing

Commission." 18 U.S.C. § 3582(c)(1)(A); *United States v. Saldana*, No.

19-7057, 2020 WL 1486892, at *3 (10th Cir. Mar. 26, 2020). Nor did

Congress remove the directive that the Commission, not the judiciary,

adopt the policies regarding "what should be considered extraordinary

and compelling reasons for sentence reduction." 28 U.S.C. § 994(a)(2)(C)

& (t).

   In that sense, the compassionate-release standard mirrors the

identically-worded standard for sentence reductions under 18 U.S.C.

§ 3582(c)(2) based on retroactive guideline amendments. In both

contexts, the Sentencing Commission's policy statements place "hard

limit[s] on a court's ability to reduce the sentence." *United States v.*

*Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). And the Supreme Court has

upheld those limits under § 3582(c)(2), stressing that "Congress charged

the Commission with determining in what circumstances and by what

amount the sentences of prisoners affected by Guidelines amendments

may be reduced." *Dillon v. United States*, 560 U.S. 817, 830 (2010). So

even when an inmate asks a district court to disregard those limits, the

Commission's restraints "on a district court's sentence-reduction authority [are] absolute." *Jackson*, 751 F.3d at 711; *accord United States v. Horn*, 612 F.3d 524, 527–28 (6th Cir. 2010).

For compassionate release, the Sentencing Commission has fulfilled Congress's directive in its policy statement in USSG § 1B1.13. That policy statement limits "extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other reasons "[a]s determined by the Director of the Bureau of Prisons." USSG § 1B1.13 cmt. n.1. Unless an inmate's circumstances fall within those categories, he is not eligible for compassionate release. 18 U.S.C. § 3582(c)(1)(A); *Saldana*, 2020 WL 1486892, at *3; *cf. Dillon*, 560 U.S. at 830.

Howard relies on his medical conditions in seeking release, but he is not eligible for compassionate release on that basis. Howard's conditions are not terminal, and every indication is that his health is stable. None of his conditions are so severe that they "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." *See* USSG § 1B1.13 cmt. n.1.

Nor is Howard correct in suggesting that the COVID-19 pandemic should alter this analysis here. At 46 years old, Howard is a relatively young man, which places him in a lower risk group were he to develop COVID-19. Howard notes that he has asthma, but records show that he has not had an asthma attack in five years. (Exhibit 2, Medical Records, pg. 8). And asthma is far from a rare disorder; approximately 1 in 13 Americans have some degree of the disorder. https://www.aafa.org/asthma-facts/. There is nothing extraordinary about Howard's medical conditions that qualifies him for compassionate release.

Rather, the crux of Howard's claim is a generalized assertion that he *could* contract COVID-19 and that the virus *could* jeopardize his health, and that the risk of those things happening in prison is greater than the risk of them happening on release. But Howard sidesteps an important consideration in that analysis: the likelihood that he would *still* contract COVID-19, even if released. COVID-19 is—and will continue to be—widespread among the public for many months. Howard's prior conduct also shows that he would be unlikely to follow even basic restrictions on release, much less the CDC's social-distancing

protocols or the Governor's stay-at-home order. Given this reality, it is hardly clear that Howard faces a greater risk in prison than he would if released. And in any event, Howard's speculation on this point is not enough to satisfy § 1B1.13's criteria.

Nor is Howard eligible for compassionate release based on the "other reasons" category. For this category, the Bureau of Prisons has issued [Program Statement 5050.50](), which contains standards for eligibility that are related to but somewhat more extensive than the first three categories. Howard has not shown that he satisfies those standards.

Further, because Congress and the Sentencing Commission have mandated that "other reasons" for eligibility be determined by the Bureau of Prisons, not the judiciary, the Court lacks the authority to grant compassionate release based solely on the general threat posed by the COVID-19 pandemic. *See United States v. Saldana*, No. 19-7057, 2020 WL 1486892, at *3 (10th Cir. Mar. 26, 2020); *United States v. Lynn*, 2019 WL 3805349, at *4-5 (S.D. Ala. Aug. 13, 2019); *United States v. Shields*, 2019 WL 2359231, at *4 (N.D. Cal. June 4, 2019); *United States v. Willingham*, 2019 WL 6733028, at *2 (S.D. Ga. Dec. 10,

2019); *United States v. McGraw*, 2019 WL 2059488, *2 (S.D. Ind. 2019);

*United States v. Washington*, 2019 WL 6220984, at *2 (E.D. Ky. Nov.

21, 2019); *United States v. Willis*, 382 F. Supp. 3d 1185, 1187 (D.N.M.

2019); *United States v. Ebbers*, 2020 WL 91399, *4 (S.D.N.Y. Jan. 8,

2020); *United States v. Overcash*, 2019 WL 1472104, at *2 (W.D.N.C.

Apr. 3, 2019); *United States v. York*, 2019 WL 3241166, at *4 (E.D.

Tenn. July 18, 2019).

Even if that judicial authority existed, the COVID-19 pandemic

does not qualify as the type of inmate-specific reason permitting

compassionate release. As the Third Circuit explained, "the mere

existence of COVID-19 in society and the possibility that it may spread

to a particular prison alone cannot independently justify compassionate

release, especially considering BOP's statutory role, and its extensive

and professional efforts to curtail the virus's spread." *United States v.*

*Raia*, __ F.3d __, No. 20-1033, at 8 (3d Cir. Apr. 8, 2020) (opinion

amended on Apr. 8, 2020). The Bureau of Prisons has worked around

the clock to implement precautionary measures reducing the risk from

COVID-19 to Howard and other inmates. And if COVID-19, standing

alone, qualified as an "extraordinary and compelling reason" for relief,

there would be no limiting principle: *every* inmate—no matter his actual risk of contracting COVID-19 in prison, no matter his risk of contracting COVID-19 if released, and no matter his risk of developing complications from COVID-19, either in prison or on release—would be presumptively entitled to relief under § 3582(c)(1)(A). Nothing in the statute or USSG § 1B1.13 supports such an unbounded interpretation. *See Raia, ___ F.3d ___, No. 20-1033, at 8*. Howard is not eligible for compassionate release.

### C.   The factors set forth in 18 U.S.C. § 3553(a) also do not support relief.

Even when an inmate is statutorily eligible for a sentence modification based on an "extraordinary and compelling reason," compassionate release is not necessarily appropriate. Before ordering relief, courts must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that the inmate "is not a danger to the safety of any other person or to the community." USSG § 1B1.13(2). So even if the Court were to find Howard eligible for compassionate release, the § 3553(a) factors and § 1B1.13(2) should still disqualify him.

Howard is a professional drug dealer, who was one of the leaders of a significant, years' long conspiracy to move large quantities of heroin

and cocaine, and the cash from their sale. This was no ordinary crew of street level drug dealers. Nearly all of the individuals involved and prosecuted were men in their 40s to 60s, and they used their age and maturity to their advantage and ran a professional organization. It was highly successful, for years. And that organization would not have run without Howard's work in procuring bulk shipments of drugs. He was the key player.

Howard was very fortunate to be sentenced to the five year mandatory minimum for his conduct, and he is now attempting to undercut even that minimum sentence by taking advantage of a nearly unprecedented pandemic. Howard earned every bit of the prison sentence that he received, and he should be required to serve it out.

## Conclusion

Howard's motion should be denied.

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney

s/ Brant Cook
Assistant U.S. Attorney
211 West Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9756

brant.cook@usdoj.gov

Dated: April 15, 2020

## Certificate of Service

I certify that on April 15, 2020, I electronically filed the foregoing document with the Clerk of the Court for the Eastern District of Michigan using the ECF system, which will send notification of the filing to all users of record.

s/ Brant Cook
Assistant U.S. Attorney